AB:PP

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ONE APPLIE IPHONE CELLULAR DEVICE, MODEL IPHONE X, IMEI NUMBER 35 6722087855333 | APPLICATION FOR A SEARCH WARRANT FOR AN ELECTRONIC DEVICE<br><br>Case No. 19-MJ-800 |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, DAMON GERGAR, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a detective employed by the New York Police Department and I have been a police officer for 19 years. I have been a detective for over 10 years, including being assigned to the Vice Major Case Squad for approximately 8 years and a Task Force Officer for 2 years with Border Enforcement Security Task Force with the Department of Homeland Security.  My responsibilities include investigations of cases involving the promotion of a sexual performance by a child through the use of electronic devices and the internet, possession and distribution of child pornography through the use of electronic devices and

the internet, as well as dissemination of indecent material to minors, and other incidents of the exploitation of children on the internet.  I have gained expertise in this area through training in classes and daily work related to conducting these types of investigations. As part of my responsibilities, I have been involved in the investigation of numerous child pornography and child exploitation cases.

3.      I have personally participated in the investigation of the offenses discussed below.  I am familiar with the facts and circumstances of this investigation from: my personal participation in the investigation, my review of documents, my training and experience, and discussions I have had with other law enforcement personnel concerning the creation, distribution, and proliferation of child pornography.  Additionally, statements attributable to individuals herein are set forth in sum and substance and in part.

4.      HSI is investigating the coercion or inducement of a minor to have sex, in violation of Title 18, United States Code, Section 2422(b), and the possession, access with intent to view, transportation, receipt, distribution and reproduction of sexually explicit material relating to children, in violation of Title 18, United States Code, Sections 2252 and 2252A.

5.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

6.      The property to be searched is an APPLIE IPHONE CELLULAR DEVICE, MODEL IPHONE X, IMEI NUMBER 35 6722087855333, hereinafter the "Device."  The Device is currently in the custody of HSI within the Eastern District of New York.

7.      The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

8.      On September 5, 2019, I and other law enforcement officials arrested Jason Sato for coercion and enticement of a minor to have sex, in violation of Title 18, United States Code, Section 2422(b).  The Complaint in support of that arrest is incorporated herein and attached as Exhibit A.

9.      As set forth in more detail in that complaint, from on or about August 21, 2019 through September 5, 2019, I communicated in an undercover capacity with Jason Seto.  I told Seto that I was a 14-year-old boy.  The defendant stated that was the "perfect age."  As described in Exhibit A, Sato repeatedly attempted to coerce and entice me to have sex with him.  After learning I was 14, the defendant repeatedly discussed the sexual acts he wanted to do with me.  As just one example, the defendant said "I want to stand up and have u on ur knees sucking me while u call me daddy."  On September 5, 2019, Seto was arrested when he attempted to meet up with the individual he believed was 14 years old.

3

10.     As part of those communications, Sato discussed viewing child pornography. He called it "underground porn. Not legal lol.  Young boys and girls getting fucked by dads." He asked me if I would "get turned on seeing a dad fuk his young son."   When I told him that the videos of dads and boys having sex sounded hot, the defendant responded "it is."

11.     Seto discussed how he wanted us to watch child pornography when we met up. The defendant said he watched liking pornography of boys "younger" than me, i.e., younger than 14 years old.  The defendant sent me four videos during the course of our conversations. Although the ages of the individuals in the video are not clear, based on my training and experience, it appears that at least one of the videos may be of an underage boy.   During another conversation, the defendant said he could send me a video of two young boys.  In addition, based on my training and experience, individuals who attempt to have sex with underage children often view and possess child pornography.

12.     During his Mirandized post-arrest interview, the defendant gave me consent to search the phone in his possession (the Device), which had been seized incident to arrest, for the chats with the individual he believed to be 14 years old.  The Device contained the chats that I had with him on the Telegram application where he attempted to entice me, posing as a 14-year-old boy, to have sex.  In addition, upon looking at the Device with the defendant during his post-arrest interview, these four videos discussed above appeared on the Device.

13.     As discussed above, the Device was recovered from Seto upon his arrest and is currently in the lawful possession of the HSI within the Eastern District of New York.  In my training and experience, I know that the Device has been stored in a manner in which its

4

contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the HSI.

## TECHNICAL TERMS

14.    Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.    Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.   Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.   Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.   GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to

6

another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also

include global positioning system ("GPS") technology for determining the location of the device.

f.   IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

15.   Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

8

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

16.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

17.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to

9

draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

18.   *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

19.   *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not

involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable

cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

20.     I submit that this affidavit supports probable cause for a search warrant

authorizing the examination of the Device described in Attachment A to seek the items

described in Attachment B.

Respectfully submitted,

S/ Damon Gergar
_____
DAMON GERGAR
Task Force Officer
United States Department of Homeland Security,
Homeland Security Investigations

Sworn to before me this
6th day of September, 2019

S/ Roanne Mann
_____
THE HONORABLE ROANNE L. MANN
CHIEF UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

## ATTACHMENT A

1.      The property to be searched is the property to be searched is an APPLIE

IPHONE CELLULAR DEVICE, MODEL IPHONE X, IMEI NUMBER 35

6722087855333, hereinafter the "Device."  The Device is currently in the custody of HSI

within the Eastern District of New York.  This warrant authorizes the forensic examination

of the Device for the purpose of identifying the electronically stored information described in

Attachment B.

## ATTACHMENT B

1.      All records on the Device described in Attachment A that relate to violations

of 18 U.S.C. §§ 2251, 2252, and 2252A, and 2422(b) since September 6, 2018, including:

    a.  evidence involving the coercion or inducement of minors to have sex, in

       violation of 18 U.S.C. § 2422(b).

    b.  images of child pornography and files containing images of child pornography

       and records, images, information or correspondence pertaining to the

       possession, access with intent to view, receipt and distribution of sexually

       explicit material relating to children, in violation 18 U.S.C. §§ 2252 and

       2252A, in any form wherever they may be stored or found;

    c.  motion pictures, films, videos, and other recordings of visual depictions of

       minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

    d.  records and information pertaining to the preparation, purchase and acquisition

       of names or lists of names to be used in connection with the purchase, sale,

       trade or transmission of any visual depiction of minors engaged in sexually

       explicit conduct;

    e.  records and information concerning any Internet accounts used to possess,

       receive or distribute child pornography; and

2.      Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

a.   records of Internet Protocol addresses used;

b.   records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

2

# EXHIBIT A

AB:PP

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – X

UNITED STATES OF AMERICA

- against -

JASON SETO,

Defendant.

– – – – – – – – – – – X

<u>COMPLAINT</u>

(T. 18, U.S.C., § 2422(b))

19-MJ-795

EASTERN DISTRICT OF NEW YORK, SS:

DAMON GERGAR, being duly sworn, deposes and states that he is a Detective with the New York City Police Department and Task Force Officer with the Border Enforcement Security Task Force with the Department of Homeland Security, duly appointed according to law and acting as such.

In or about August 21, 2019 through September 5, 2019, within the Eastern District of New York and elsewhere, the defendant JASON SETO did, using the mail or a facility or means of interstate commerce, knowingly attempt to persuade, induce, entice, or coerce any individual who has not attained the age of 18 years to engage in any sexual activity for which any person can be charged with a criminal offense.

(Title 18, United States Code, Section 2422(b)).

The source of your deponent's information and the grounds for her belief are as follows[1]:

---

[1]  Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I

1.     I am a detective employed by the New York Police Department and I have been a police officer for 19 years. I have been a detective for over 10 years, including being assigned to the Vice Major Case Squad for approximately 8 years and a Task Force Officer for 2 years with Border Enforcement Security Task Force with the Department of Homeland Security.   My responsibilities include investigations of cases involving the promotion of a sexual performance by a child through the use of electronic devices and the internet, possession and distribution of child pornography through the use of electronic devices and the internet, as well as dissemination of indecent material to minors, and other incidents of the exploitation of children on the internet.   I have gained expertise in this area through training in classes and daily work related to conducting these types of investigations. As part of my responsibilities, I have been involved in the investigation of numerous child pornography and child exploitation cases.

2.     I have personally participated in the investigation of the offenses discussed below.   I am familiar with the facts and circumstances of this investigation from: my personal participation in the investigation, my review of documents, my training and experience, and discussions I have had with other law enforcement personnel.   Additionally, statements attributable to individuals herein are set forth in sum and substance and in part.

3.     On or about August 21, 2019, I began working in an undercover capacity via an Internet-connected smartphone to conduct an investigation into individuals attempting to have sex with underage boys.   I initially was contacted by an individual, who I later determined was the defendant, JASON SETO, on a dating application which individuals

_____

am aware.

primarily use to meet up to have sexual contact.   The defendant sent me a picture of himself, which included his face, as well as a picture of his penis.   Within approximately 15 minutes of talking to the defendant, I told him I was 14 years old.   The defendant responded "cool," and continued talking to me.   The defendant asked if I liked "older."   The defendant said he was my "daddy" and that I was "[his] son."   The defendant asked if I like giving and receiving oral sex.   Also on that day, the defendant asked if I was free to meet up.

4.       The defendant JASON SETO requested that we continue the conversation on Telegram, an encrypted chat application, which we did.   Once on the Telegram application, he said it was "better to chat on here."   Later the defendant stated "We have to both delete the convos each time this app is super private and that's why I suggested . . . . u get it.   It's encrypted."

5.       The defendant JASON SETO also asked "so can u keep us a secret," and when I responded I said I could, he said "cool … I have to ask to make sure ur down."   He then said that he wanted to give me oral sex, kiss me, and "can't wait until u suk me … u gonna like daddy's dick."   Conversations of this nature between myself and the defendant continued repeatedly, even after I again said that I was 14 years old.   At one point shortly after saying that I was 14, the defendant responded "I like young."   The defendant also said "I want ur boy dick."   When I responded "I'm not 5.   I'm 14," the defendant responded "I like . . . perfect age."

6.       The defendant JASON SETO repeatedly expressed interest in meeting up with me.   When I asked what he wanted to do when we meet up, he responded, "Get to know, kiss and suk dick."   The defendant later said he wanted to engage in intercourse with

4

me.   The defendant repeatedly discussed what sexual acts he would do with me when we met

up.   For example, on another occasion, the defendant stated "I want to stand up and have u on

ur knees sucking me while u call me daddy."   As another example, the defendant said "I want

u to get naked and sit back and let me suk u.   Yeah I want to please until u cum."

7.      The defendant JASON SETO also requested that I send nude photos of

myself.   When I hesitated, the defendant replied "I'm not asking u to send ur face in it and

honestly I been giving u my trust and I deserve some back."   At one point, the defendant

referred to the fact that I had already seen his penis.

8.      The defendant JASON SETO discussed how he wanted us to watch

child pornography when we met up.   The defendant said he watched liking pornography of

boys "younger" than me, i.e., younger than 14 years old.   The defendant sent me four videos

during the course of our conversations.   Although the ages of the individuals in the video are

not clear, based on my training and experience, it appears that at least one of the videos may

be of an underage boy.   During the course of our conversations, the defendant said he wanted

to watch these types of videos with me.

9.      Law enforcement officials determined, using the photograph of the

defendant JASON SETO's face that he sent me and comparing it with known photographs of

the defendant, that the photograph the defendant sent me was of a JASON SETO.   In

addition, during our conversations, the defendant used the alias "Carlos Sanchez" as his

username.   Eventually I asked if Carlos was his real name, and the defendant replied, "Jason

Carlos."

5

10.     When talking on the dating application, the defendant JASON SETO
sent me the GPS coordinates of where he was located in Queens, NY.   The coordinates were
less than .4 miles from the defendant's home address, in Astoria in Queens.   In addition,
when I told the defendant I was near LaGuardia Airport, he said "ur super close to me . . ."
The defendant's address is approximately 2.5 miles from LaGuardia Airport.

11.     The defendant JASON SETO repeatedly asked when we could meet up.
For example, on August 23, 2019, he said "so can we chill next week what u think?"   When
asked what he would want to do when we met up, he said "Get to know, kiss and suk dick."
On August 24, 2019, he wrote "What is really important to me is that me seeing u make time
for us next week so we can see each other."   At one point, when I said that I usually resided
in the Dominican Republic, the defendant offered to fly down there to see me.   On September
5, after two weeks of discussing the sexual acts he wanted to do with me, and just one day
earlier saying to me "I want to suck u and be sucked," the defendant and I discussed where we
could meet up the next day.   I asked if we could meet at the Five Guys at LaGuardia Airport.
The defendant stated after we met "we can head back to my place."   We eventually planned
to meet at approximately 6:00 p.m.   At 5:36 p.m., the defendant texted me that he could meet
up in thirty minutes or less.

12.     On September 5, 2019, at approximately 5:50 p.m., law enforcement
officers observed the defendant JASON SETO leaving his residence in Astoria.   At
approximately 6:07 p.m., law enforcement officers observed the defendant arrive at
LaGuardia Airport.   The defendant messaged me asking where I was, and I said I was in the
bathroom.   Law enforcement officers then observed the defendant go to the bathrooms at

6

LaGuardia Airport.   I then messaged the defendant that I was at the Five Guys, the restaurant where we originally planned to meet.   Law enforcement officers then observed the defendant go to the Five Guys.   When he entered the Five Guys, I and other law enforcement officers placed the defendant under arrest.

13.     After his arrest, I read the defendant JASON SETO his <u>Miranda</u> rights, which he waived, and he signed a <u>Miranda</u> waiver form.   The defendant then admitted that he was the one talking to an individual who said he was 14 years old.

14.     During his <u>Mirandized</u> post-arrest interview, the defendant JASON SETO gave me consent to search the phone in his possession for the chats with the individual he believed to be 14 years old.   The defendant's phone contained the chats that I had with him on the Telegram application where he attempted to entice me, posing a 14-year-old boy, to have sex.

WHEREFORE, your deponent respectfully requests that the defendant JASON SETO be dealt with according to law.

_____
DAMON GERGAR
Task Force Officer
United States Department of Homeland Security,
Homeland Security Investigations

Sworn to before me this
6th day of September, 2019

_____
THE HONORABLE ROANNE L. MANN
CHIEF UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK